IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

Thomas E. Perez, Secretary of Labor,      )
United States Department of Labor,        )
                                          )
                    Plaintiff,            )      C.A. No. 8:15-4794-HMH
                                          )
          vs.                             )
                                          )      **OPINION & ORDER**
Work Services, Inc.; Joseph Paul Byrd,    )
an Individual; and David Perez,           )
an Individual,                            )
                                          )
                    Defendants.           )

This matter is before the court on the Plaintiff's motion for summary judgment. The

Plaintiff filed this case asserting claims against the Defendants, Work Services, Inc., Joseph Paul

Byrd ("Byrd"), and David Perez ("Perez") (collectively, "Defendants"), for violations of the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. After consideration, the court grants

the Plaintiff's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff commenced this litigation on December 2, 2015, alleging that the

Defendants owe back wages for the time period from December 3, 2012 to December 15, 2014

to four intellectually disabled individuals, Leon Jones, Jay Koch, John Koch, and Carlos Morris

(collectively "Disabled Workers") based on willful violations of the FLSA. (Compl., generally,

ECF No. 1.) On January 13, 2017, the Plaintiff moved for summary judgment. The Defendants

responded in opposition on January 27, 2017. The Plaintiff filed a reply on February 3, 2017.

This matter is now ripe for consideration.

1

In 1985, Byrd purchased the Newberry, South Carolina, portion of the Henry's Turkey Service business and named the new business, Work Services, Inc. ("Work Services").  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 17), ECF No. 66-1.)  Further, Byrd retained approximately 15 intellectually disabled employees that were working for Henry's Turkey Service at that time.  (Id. Ex. 1 (Byrd Dep. 22), ECF No. 66-1.)  Work Services provides labor services to Kraft Foods Global at its turkey processing plant in Newberry, South Carolina.  (Id. Ex. 4 (Admission No. 3), ECF No. 66-4.)  Specifically, Work Services employs workers to retrieve live turkeys and assist in killing and processing them.  (Id. Ex. 1 (Byrd Dep. 34, 39), ECF No. 66-1.)   During the relevant time period, Work Services employed between 30 and 35 employees.  (Id. Ex. 4 (Admission No. 4), ECF No. 66-4.)  The Disabled Workers' daily tasks were retrieving and hanging live turkeys on the line.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 39-40), ECF No. 66-1.)

During the relevant time period, the Disabled Workers resided in housing near the turkey plant, known as the "Bunk House," which was owned by a company solely owned and operated by Byrd.  (Id. Ex. 1 (Byrd Dep. 17), ECF No. 66-1 & Ex. 3 (Keira Ellis ("Ellis") Aff. ¶ 3f), ECF No. 66-3.)  Perez is employed at Work Services and managed and supervised the Disabled Workers.  (Id. Ex. 4 (Admission No. 2), ECF No. 66-4.)  In addition, Byrd resided in the Bunk House.  (Id. Ex. 1 (Byrd Dep. 49), ECF No. 66-1.)  The Bunk House consists of two connected double-wide mobile homes and has housed as many as ten workers at a time.[1]  (Id. Ex. 1 (Byrd

---

[1]Two other intellectually disabled workers also resided in the Bunk House during the relevant time period, Claude Wren and Johnny Hickman.  However, Mr. Wren and Mr. Hickman are not involved in this case because it is undisputed that they did not work during the relevant time period due to health issues.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 43-45), ECF No. 66-1.)

Dep. 48-50), ECF No. 66-1.)  The Disabled Workers were charged $800.00 per month for room and board, which included housing and two meals a day, five days a week.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 69, 71), ECF No. 66-1.)  There are no records regarding the cost of the meals or the value of the housing provided to the Disabled Workers.

According to the Defendants' weekly time sheets, the Disabled Workers worked between 30 and 40 hours per week, and occasionally over 40 hours during the relevant time period.  (Def. Mem. Opp'n Summ. J. Ex. 1 (Time Sheets), ECF No. 70.); (Pl. Mem. Supp. Summ. J. Ex. 3 (Ellis Aff. ¶ 5), ECF No. 66-3.)  The weekly summary time sheets were provided every week to an accountant for issuing weekly payroll.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 88-89), ECF No. 66-1.)  Also, according to the Defendants' payroll records, the Disabled Workers were paid between $7.50 and $8.00 per hour.  (Id. Ex. 3 (Ellis Aff. ¶ 3d), ECF No. 66-3.)  The nondisabled employees performing the same job were paid approximately $2.00 more per hour. (Id. Ex. 3 (Ellis Aff. ¶ 3d), ECF No. 66-3 and Ex. 1 (Byrd Dep. 89), ECF No. 66-1.)  The Defendants allege that during the relevant time period Jay Koch and Carlos Morris did not work and that they were paid a weekly paycheck to ensure that they were ultimately eligible for Social Security income in the future.  (Def. Mem. Opp'n. Summ. J. Ex. 2 (Byrd Aff. ¶¶ 3-4), ECF No. 70-2, and Ex. 1 (Perez Aff. ¶¶ 3-4), ECF No. 70-1.)

According to Byrd and Perez's deposition testimony, Byrd or Perez routinely signed the Disabled Workers' names on the back of their respective paychecks and cashed the checks.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 95-96, 98), ECF No. 66-1, and Ex. 2 (Perez Dep. 51, 59), ECF No. 66-2.)  Byrd states that he retained the money from the cashed paychecks in individual envelopes for each Disabled Worker.  (Id. Ex. 1 (Byrd Dep. 98-99), ECF No. 66-1.)

3

Perez testified that when he cashed the Disabled Workers' checks, he would deliver the money

to Byrd and that he had never seen any envelopes.  (Id. Ex. 2 (Perez Dep. 54-55), ECF No. 66-

2.)  The Defendants have no records or accounting for how the Disabled Worker's cashed

paychecks in the envelopes was spent.  (Id. Ex. 1 (Byrd Dep. 99-100), ECF No. 66-1.)  Byrd

states in his affidavit that he never denied the Disabled Workers' requests for money from their

envelopes.  (Def. Mem. Opp'n. Summ. J. Ex. 2 (Byrd Aff. ¶ 6), ECF No. 70-2.)

Byrd and Perez allegedly provided the Disabled Workers a weekly allowance ranging

from $50.00 to $80.00.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 97), ECF No. 66-1, and Ex.

2 (Perez Dep. at 52-53), ECF No. 66-2.)  In addition, the Disabled Workers had to request

additional money for purchases beyond the weekly allowance, and Byrd determined whether to

grant each request in his sole discretion.  (Id. Ex. 1 (Byrd Dep. 99), ECF No. 66-1.)  Further, the

Defendants allege that Perez and Byrd regularly drove the Disabled Workers to appointments

and to town to shop.  (Def. Mem. Opp'n Summ. J. Ex. 1 (Perez Aff. ¶ 7), ECF No. 70-1, and

Ex. 2 (Byrd Aff. ¶ 7), ECF No. 70-2.)

In addition, the Defendants deposited Mr. Jones' and Mr. Morris' monthly Social

Security checks into a bank account, which was named "Work Services Association" ("Work

Services account") and was fully controlled by the Defendants.[2]  (Pl. Mem. Supp. Summ. J. Ex.

1 (Byrd Dep. 79), ECF No. 66-1, and Ex. 3 (Ellis Aff. ¶ 3e), ECF No. 66-3.)  The $800.00

charge for room and board was allegedly deducted from Mr. Morris' and Mr. Jones' monthly

social security checks and John and Jay Koch's paychecks.  (Id. Ex. 1 (Byrd Dep. 77), ECF No.

---

[2] The other two Disabled Workers, John and Jay Koch, did not receive any Social
Security checks during the relevant time period.

66-1.)  In addition, the Disabled Workers' state and federal tax refunds were deposited into the

Work Services account.  (Id. Ex. 1 (Byrd Dep. 97 and Ex. 18 to Byrd Dep.), ECF No. 66-1.)  All

of the funds deposited into the Work Services account were the funds of the Disabled Workers

or the two other intellectually disabled men residing in the Bunk House.[3]  (Id. Ex. 1 (Byrd Dep.

140-41), ECF No. 66-1.)  It is uncontested that the Defendants utilized the Work Services

account to pay business and personal expenses such as Byrd's credit card bills, Byrd's and

Perez's cell phone bills, utility bills and repair bills for the Bunk House, wireless internet bills,

and vehicle repairs.  (Id. Ex. 1 (Byrd Dep. 144-53 and Ex. 18 to Byrd Dep.), ECF No. 66-1, and

Ex 2 (Perez Dep. 77, 83), ECF No. 66-2.)  Byrd and Perez were authorized signatories on the

account.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 143 and Ex. 18 to Byrd Dep.), ECF No.

66-1, and Ex 2 (Perez Dep. 77), ECF No. 66-2.)  It is undisputed that the Disabled Workers did

not possess any credit cards, computers, or cell phones.  (Id. Ex. 1 (Byrd Dep. 145), ECF No.

66-1.)  The Defendants failed to keep any accounting of the money in the account or how the

money was being spent from the Work Services account.  (Id. Ex. 1 (Byrd Dep. 160), ECF No.

66-1, and Ex. 5 (Def. RFP), ECF No. 66-5.)

In August 2014, Jay and John Koch moved to Colorado to live with relatives, and Byrd

alleges that he provided them with the "full amount of their envelope," which he states was

around $3,700 or $3,800 dollars.  (Id. Ex. 1 (Byrd Dep. 104), ECF No. 66-1.)  The South

Carolina Department of Social Services removed the remaining intellectually disabled workers

residing in the Bunk House–Mr. Jones, Mr. Morris, Mr. Hickman, and Mr. Wren–on December

---

[3]Mr. Wren and Mr. Hickman also received monthly Social Security checks, $1,005.00
and $825.00 respectively, that were deposited into the Work Services account.  (Pl. Mem. Supp.
Summ. J. Ex. 1 (Byrd Dep. 137 and Ex. 17), ECF No. 66-1.)

15, 2014.  (Id. Ex. 3 (Ellis Aff. ¶ 3g), ECF No. 66-3, and Ex. 4 (Admission No. 13), ECF No. 66-4.)  Byrd testified that he provided Mr. Jones with $6,000, which he alleges was the amount in his envelope based on his 30 years of service.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 100-01), ECF No. 66-1, and Ex. 4 (Admission No. 13), ECF No. 66-4.)  Mr. Morris was provided with no money.  (Id. Ex. 1 (Byrd Dep. 103), ECF No. 66-1, and Ex. 4 (Admission No. 14), ECF No. 66-4.)  The Defendants have never possessed power of attorney or legal guardianship over the Disabled Workers.  (Id. Ex. 1 (Byrd Dep. 123), ECF No. 66-1.)

## II.  DISCUSSION OF THE LAW

### A.  Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.

A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."  Monahan v. Cty. of Chesterfield, Va., 95 F.3d 1263, 1265 (4th Cir. 1996) (internal quotation marks and citation

6

omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact."  Ballenger v. N.C. Agric. Extension Serv., 815 F.2d

1001, 1005 (4th Cir. 1987) (internal quotation marks and citation omitted).

### B.  FLSA

The Plaintiff alleges that the Defendants have violated the FLSA in failing to properly

pay the Disabled Workers in violation of the minimum wage and overtime provisions as set

forth in 29 U.S.C. §§ 206 and 207(a), and failing to retain complete and accurate payroll and

timekeeping records as set forth in 29 U.S.C. §§ 211(c)  and 215(a)(5).

### 1.  Employer

The FLSA broadly defines employer to include "any person acting directly or indirectly

in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  "The Supreme

Court has held the FLSA's definition of employer to be 'expansive' and includes individuals

with 'managerial responsibilities' who exercise 'substantial control over the terms and

conditions of the work of employees.'"  Perez v. Ocean View Seafood Rest., Inc., Civil Action

No. 3:13-03613-MGL, 2016 WL 6803779, at *6 (D.S.C. Nov. 17, 2016) (quoting Falk v.

Brennan, 414 U.S. 190, 195 (1973)).  It is undisputed that the Defendants are employers under

the FLSA.  In the answer, Byrd and Perez admit that they are employers under the FLSA.  (Ans.

¶ 2, ECF No. 15.)  Byrd is the owner of Work Services and is involved in the everyday operation

of the company including supervision, establishing policies and wages, financial decisions,

payment of wages, and managerial responsibilities.  (Pl. Mem. Supp. Summ. J. Ex. 4

(Admission Nos. 17, 18, 20, 21-22, 27), ECF No. 66-4.)  Further, Perez directly supervises more

than 16 employees and indirectly supervises 15 additional employees.  (Id. Ex. 4 (Admission

Nos. 2, 23-26), ECF No. 66-4.)  Likewise, Perez determines employee schedules, possesses the

authority to hire and fire employees, and has managerial responsibilities.  (Id. Ex. 4 (Admission

Nos. 2, 23-26), ECF No. 66-4.)

### 2.  Employee

Next, the court must determine whether the Disabled Workers qualified as employees

under the FLSA during the relevant time period.  The term "employee" in the FLSA is meant in

the broadest sense to include "any individual employed by an employer."  29 U.S.C. § 203(e)(1).

Further, the FLSA defines "employ" to mean "to suffer or permit to work."  29 U.S.C. § 203(g);

see also Rutherford Food Corp. v. McComb, 331 U.S. 722, 728 (1947) ("The definition of

'employ' is broad.")  "The words 'suffer' and 'permit' as used in § 203(g) have been

consistently interpreted to mean with the knowledge of the employer."  Davis v. Food Lion, 792

F.2d 1274, 1276 (4th Cir. 1986).  "Because the FLSA is both remedial and humanitarian in

purpose, it should be broadly interpreted and applied to effectuate its goals."  Luna-Reyes v. RFI

Const., LLC, 109 F. Supp. 3d 744, 749 (M.D.N.C. 2015) (internal quotation marks omitted).

"Under [the] FLSA, 'employees are those who as a matter of economic reality are dependent

upon the business to which they render service.'"  Dubois v. Secretary of Defense, No. 97-2074,

1998 WL 610863, at * 1 (4th Cir. Sept. 3, 1998) (unpublished) (quoting Bartels v. Birmingham,

332 U.S. 126, 130 (1947)).  The economic reality test consists of several factors including:  (1)

the degree of control exercised by the employer over the worker; (2) the worker's opportunity

for profits and losses along with their investment in the business; (3) the degree of skill and the

initiative required; (4) the permanence or duration of the working relationship; and (5) the

8

degree to which the work is integral to the employer's business.  See id.  In applying the

economic reality test, the court looks to the totality of the circumstances and recognizes that no

one factor is dispositive.  See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947).

The Defendants admit that Mr. Jones, who worked until November 2014, and John

Koch, who worked until August 2014, were employees during the relevant time period.  (Def.

Mem. Opp'n Summ. J. Ex. 2 (Byrd Aff. ¶ 3), ECF No. 70-2, and Ex. 1 (Perez Aff. ¶ 3), ECF No.

70-1.)  However, the Defendants allege that Jay Koch and Carlos Morris were not employees

because they did not work during the relevant time period.  It is undisputed that the weekly time

sheets indicate that the Disabled Workers worked between 30 and 40 hours each week and

occasionally over 40 hours.  (Def. Mem. Opp'n Summ. J. Ex. 1 (Time Sheets), ECF No. 70.);

(Pl. Mem. Supp. Summ. J. Ex. 3 (Ellis Aff. ¶ 5), ECF No. 66-3.)  The Defendants submit that

Jay Koch and Carlos Morris were paid weekly "to insure they were paying in the Social Security

system and would be able to have a Social Security income at some point in the future."  (Def.

Mem. Opp'n Summ. J. Ex. 2 (Byrd Aff. ¶ 4), ECF No. 70-2.)  In support of this argument, the

Defendants contend that "no hours were logged on the manual sheets for the . . . individuals who

did not work."  (Id. Ex. 2 (Byrd Aff. ¶ 3), ECF No. 70-2, and Ex. 1 (Perez Aff. ¶ 3), ECF No.

70-1.)

The court has reviewed the voluminous time sheets accompanying the Defendants'

response in opposition and the Defendants' argument is unsupported and contrary to the

objective evidence.  In contrast to the Defendants' statements in their affidavits, the daily time

sheets include all of the Disabled Workers' names with no daily time entries logged for any of

them.  (Id. Exs. 4-13 (Timesheets), ECF No. 70.)  Further, the weekly time sheets provided by

the Defendants denotes that all of the Disabled Workers worked between 30 and 40 hours per

week, and occasionally some worked over 40 hours.  (Def. Mem. Opp'n Summ. J. Ex. 1 (Time

Sheets), ECF No. 70.); (Pl. Mem. Supp. Summ. J. Ex. 3 (Ellis Aff. ¶ 5), ECF No. 66-3.)  The

same timekeeping practices were utilized with respect to all four Disabled Workers.  During

Byrd's deposition, the Plaintiff inquired about the daily time sheets as follows:

> Q:    And, just for the record, if you look at the next week's pay period ending
>       December 8, 2012, the weekly summary indicates that the Koches, Mr.
>       Jones, and Mr. Morris all worked 34.75 hours for the Koches; 36.75 hours
>       for Mr. Jones and 35 hours for Mr. Morris.  But then, again, on the next
>       page when you look at the daily record of hours worked, the Lines 31
>       through – sorry – 30 through 33 are the lines for Mr. Jones, the Koch
>       brothers, and Mr. Morris, but, again, there – there's no hours indicated.  Did
>       you guys have a separate place where you kept the hours worked for the
>       disabled workers?
> A:    No.  I just put their hours in at the end of the week.
> Q:    What did you base your hours worked for the end of the week if not the
>       daily time records?
> A:    Well, I just knew when they went to work and when they didn't.

(Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. at 86), ECF No. 66-1.)  Moreover, the daily time

records from the relevant time period often show hatch marks next to the names of the Disabled

Workers, including Mr. Morris and Jay Koch, which indicates the number of gloves used by

employees.  (Def. Mem. Opp'n Summ. J. Ex. 1 (Time Sheets), ECF No. 70.)  During Byrd's

deposition, he was asked about the hatch marks as follows:

> Q:    And you'll notice that there are hatch marks next to their [the Disabled
>       Workers'] names indicating that they used multiple pairs of gloves.
> A:     Uh-huh.
> Q:    They wouldn't have used gloves if they weren't working that week, would
>       they?
> A:    No. Unh-huh.

(Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 84-86), ECF No. 66-1.)

Based on the foregoing, there is no evidence to support the inference that Jay Koch and Carlos Morris were not employed, other than the Defendants' unsupported, self-serving statements to the contrary.   The only inference that can be drawn from the objective evidence including Byrd's deposition, is that, in fact, Jay Koch and Mr. Morris were employees during the relevant time period.  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); Fulks v. Metts, C.A. No. 2:06-0980-PMD-RSC, 2007 WL 2104845, at *5 (D.S.C. July 17, 2007) (unpublished) ("[A] plaintiff's affidavit consisting of conclusory statements or self-serving opinions without objective corroboration is insufficient to avoid summary judgment.").  "Unsupported allegations . . . do not confer talismanic immunity from Rule 56."  De Leon v. Saint Joseph Hosp., Inc., 871 F.2d 1229, 1236 (4th Cir. 1989). Moreover, as a matter of economic reality, the Disabled Workers were employees as the Defendants possessed complete control over the Disabled Workers, including the right to fire, set their schedules, and determine their rate of pay.  Based on the foregoing, the only inference supported by the evidence is that all of the Disabled Workers were employees of the Defendants.

### 3.  Enterprise Coverage

There are two ways an employee can recover back wages under the FLSA.  First, under individual coverage, the employee requesting FLSA protection qualifies if he is "engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(b).  "[E]mployees engaged in commerce are employees doing work involving or related to the movement of

persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof." 29 C.F.R. § 776.9 (internal quotation marks omitted). Second, under enterprise coverage, the employee can be "employed in an enterprise engaged in commerce or in the production of goods for commerce." § 207(a)(1). An "enterprise" is "related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1). This includes any enterprise "that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." Id. § 203(s)(1)(A)(I).

In addition, under enterprise coverage, the employer must have an "annual gross volume of sales made or business done" of at least $500,000.00. Id. § 203(s)(1)(A)(ii). It is undisputed that Work Services had annual gross income exceeding $500,000.00 during the relevant time period. (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 30 and Ex. 4 to Byrd Dep.), ECF No. 66-1, Ex. 3 (Ellis Aff. ¶ 3b), ECF No. 66-3.) Further, Work Services is in the business of producing goods for interstate commerce in that the turkeys harvested by Work Services ultimately are shipped all over the country for sale in grocery stores. (Id. Ex. 1 (Byrd Dep. 32-33), ECF No. 66-1, Ex. 3 (Ellis Aff. ¶ 3b), ECF No. 66-3.) Therefore, as a matter of law, Work Services is subject to enterprise coverage under the FLSA.

### 4. Violations of FLSA

### a. Conversion

In considering whether the Defendants have violated the FLSA, the Plaintiff must establish the hours worked and the work performed for which the Disabled Workers were not

paid. <u>McLaughlin v. Murphy</u>, 436 F. Supp. 2d 732, 737 (D. Md. 2005). Under the FLSA, "[e]very employer shall pay to each of his employees . . . who in any workweek . . . is employed in an enterprise engaged in commerce or in the production of goods for commerce . . . not less than the minimum wage rate in effect under subsection (a)(1) of this section." 29 U.S.C. § 206(b). Section 207(a) sets forth the requirement that employers pay overtime at the rate of one and one-half times the regular rate. 29 U.S.C. § 207(a). Further, it is unlawful for an employer to fail to preserve records including "the wages, hours, and other conditions and practices of employment maintained by him" or "to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect." 29 U.S.C. §§ 211(c) & 215(a)(5). The Plaintiff submits that the Defendants have violated the payment and recordkeeping provisions of the FLSA.

It is undisputed that Work Services' weekly time sheets reflect that the Disabled Workers regularly worked each week between 30 and 40 hours and occasionally over 40 hours. (Def. Mem. Opp'n Summ. J. Ex. 1 (Time Sheets), ECF No. 70.); (Pl. Mem. Supp. Summ. J. Ex. 3 (Ellis Aff. ¶ 5), ECF No. 66-3, and Ex. 1 (Byrd Dep. 88-89), ECF No. 66-1.) In addition, it is undisputed that the hourly time sheets for the Disabled Workers were not completed. (<u>Id.</u> Exs. 4-13 (Timesheets), ECF No. 70.) Further, there is no dispute that Byrd or Perez routinely signed the Disabled Workers' names to the checks, cashed them, and retained the funds. (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 95-96, 98), ECF No. 66-1, and Ex. 2 (Perez Dep. at 51, 59), ECF No. 66-2.) "Conversion is defined as the unauthorized assumption and exercise of the rights of ownership over goods or personal chattels belonging to another, to the alteration of

13

their condition or to the exclusion of the rights of the owner." <u>Mullis v. Trident Emergency</u>

<u>Physicians</u>, 570 S.E.2d 549, 550 (S.C. Ct. App. 2002). Byrd states that the Disabled Workers,

who are intellectually disabled, had requested that he hold "their cashed checks in envelopes

with their names on each envelope." (Def. Mem. Opp'n Summ. J. Ex. 2 (Byrd Aff. ¶ 6), ECF

No. 70-2.) Byrd alleges that he never denied the Disabled Workers access to their respective

money. (Def. Mem. Opp'n Summ. J Ex. 2 (Byrd Aff. ¶ 6), ECF No. 70-2.) Perez stated in his

deposition that he had never seen any envelopes for the Disabled Workers. (Pl. Mem. Supp.

Summ. J. Ex. 2 (Perez Dep. at 54-55), ECF No. 66-2.) In his affidavit, Perez states that "[t]o my

knowledge, these individuals requested that Mr. Byrd hold their cashed checks in envelopes with

their names on each envelope. I did not have access to these envelopes at any time." (Def.

Mem. Opp'n Summ. J. Ex. 1 (Perez Aff. ¶ 4) ECF No. 70-1.) Thus, Perez concedes he does not

have any personal knowledge about whether the Disabled Workers had asked Byrd to hold their

cashed checks and what was actually done with the cashed checks. The Defendants had no

authority to engage in this course of conduct as the Defendants were not the Disabled Workers'

guardians and did not possess any powers of attorney for the Disabled Workers. (Pl. Mem.

Supp. Summ. J. Ex. 1 (Byrd Dep. 123), ECF No. 66-1.)

According to the Defendants, the Disabled Workers were provided a weekly allowance

of $50 to $80 per week. (<u>Id.</u> Ex. 1 (Byrd Dep. 97), ECF No. 66-1, and Ex. 2 (Perez Dep. at 52-

53), ECF No. 66-2.) Further, the Defendants allege that if the Disabled Workers wanted

additional money to purchase something, they had to ask permission and the request was granted

in Byrd's sole discretion. (<u>Id.</u> Ex. 1 (Byrd Dep. 99), ECF No. 66-1.) However, again the record

14

is devoid of any recordkeeping or accounting for how much the Disabled Workers were actually paid or of any deductions from their cashed paychecks. (Id. Ex. 1 (Byrd Dep. 99-100), ECF No. 66-1.)

Based on the foregoing and the undisputed facts in this case, the Defendants converted the Disabled Workers' paychecks without authority. There is no competent evidence that the Defendants actually paid the Disabled Workers any of their wages during the relevant time period. To the contrary, the only evidence is that Byrd or Perez signed the Disabled Workers' names on the back of the paychecks and cashed the paychecks, but did not provide the funds to them. Byrd's self-serving affidavit stating that the Disabled Workers, who are intellectually disabled, independently requested that he hold their cashed paychecks in separate envelopes is ludicrous.[4] (Def. Mem. Opp'n Summ. J Ex. 2 (Byrd Aff. ¶ 6), ECF No. 70-2.) Further, the record is devoid of accounting records or documentation with respect to the Disabled Workers' cashed paychecks that would support the Defendants' position. "[I]n the absence of other corroborating record evidence, such self-serving declarations or affidavits do not suffice to allow a party to defeat summary judgment." Lake Wright Hosp., LLC v. Holiday Hosp. Franchising, Inc., Civil Action No. 2:07CV530, 2009 WL 2606254, at *3 n.3 (E.D. Va. Aug. 20, 2009) (unpublished); see De Leon, 871 F.2d at 1236 ("Unsupported allegations . . . do not confer

---

[4]Even if the Disabled Workers "requested" that Byrd hold their cashed checks in envelopes, this arrangement violates 29 C.F.R. § 531.35, which requires that wages be provided "free and clear" and "finally and unconditionally" to an employee. The purpose of the FLSA is to protect workers and the Disabled Workers in this case are some of the most vulnerable. The Disabled Workers could not waive their rights under the FLSA. See Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 740 (1981) ("FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate."). Thus, any agreement with respect to the Disabled Workers' wages that is contrary to the FLSA is without effect.

talismanic immunity from Rule 56.")  It is impossible to determine what, if anything, the

Disabled Workers were paid and any attempt to do so, amounts to sheer speculation.  Moreover,

the Defendants provided wage reports that were false, indicating that the Disabled Workers

received wages in the amounts stated in the payroll records, when in fact, the Defendants

retained the wages.  (Pl. Mem. Supp. Summ. J. Ex. 3 (Ellis Aff. ¶ 8), ECF No. 66-3.)  For all the

reasons discussed above and having found no genuine issues of material fact, as a matter of law,

the Defendants have violated §§ 206(b) and 207(a), the payment provisions, and §§ 211(c) and

215(a)(5), the recordkeeping provisions for wages, of the FLSA.

### b.  Credits

The Defendants allege that "[e]ven if all four men were entitled to any damages, the

amount would be offset by the amount each person did receive," alleging that "[i]t is undisputed

that they were provided room, board and multiple other services."  (Defs. Mem. Opp'n 7, ECF

No. 70.)

### i.  Weekly Allowance

The Defendants allege that the Disabled Workers were paid a weekly allowance of $50

to $80 per week and sometimes provided money upon request to purchase more expensive

items.  "Under the FLSA, an employer is required to pay each employee wages at or above the

minimum wage rate each workweek, . . . and such wages must be paid 'finally and

unconditionally' or 'free and clear.'"  Garcia v. Frog Island Seafood, Inc., 644 F. Supp. 2d 696,

705 (E.D.N.C. 2009) (quoting 29 C.F.R. § 531.35).  "[A]n employer violates the FLSA where

kickbacks 'directly or indirectly to the employer or to another person for the employer's benefit'

16

reduce the employee's compensation below the minimum wage." <u>Moodie v. Kiawah Island Inn Co.</u>, 124 F. Supp. 3d 711, 717 (D.S.C. 2015) (quoting 29 C.F.R. § 531.35).

The Defendants are not entitled to any credit for payment of a weekly allowance or occasional payments of money to the Disabled Workers. The Defendants failed to keep any records with respect to these alleged payments making it impossible to determine what amounts, if any, were provided to the Disabled Workers. (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 99-100), ECF No. 66-1.) Further, the evidence from the records is that the allowance was paid to all of the intellectually disabled individuals residing in the Bunk House irrespective of whether they were working. For example, Byrd testified that he paid Mr. Hickman a weekly allowance despite the fact that it is undisputed that he was not working during the relevant time period. (<u>Id.</u> Ex. 1 (Byrd Dep. 99), ECF No. 66-1.) Thus, the payment of a weekly allowance was not part of the Disabled Workers' wages.

Further, with respect to money exceeding the weekly allowance, it is undisputed that the Disabled Workers had to request permission for additional money and that request was granted or denied in the sole discretion of Byrd. (<u>Id.</u> Ex. 1 (Byrd Dep. 99), ECF No. 66-1.) Therefore, even accepting the Defendants' arguments, the Disabled Workers were not granted unfettered access to their wages. In addition, employers are required to keep records regarding "deductions from wages paid each pay period including employee purchase orders or wage assignments. Also, in individual employee records, the dates, amounts, and nature of the items which make up the total additions and deductions." 29 C.F.R. § 516.2(a)(10). Therefore, even if the Defendants paid a weekly allowance or other occasional monies to the Disabled Workers, this violates the FLSA's requirements that wages be paid "free and clear" and the employer retain records of

17

deductions.  Based on the foregoing, the Defendants are not entitled to any offset for payment of a weekly allowance or for money occasionally requested by the Disabled Workers.

### ii. Deductions for Room and Board

The Defendants are not entitled to any offset for room and board because they failed to keep any records regarding the reasonableness of Disabled Workers' payment of $800.00 per month for room and board.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 76), ECF No. 66-1, and Ex. 5 (RFP No. 16), ECF No. 66-5.)  An employer who makes deductions from an employee's wages for board, lodging, or other facilities is required, except in limited circumstances which are not applicable here, to maintain records substantiating its cost.  29 C.F.R. § 516.27(a).3 (providing that "in addition to keeping other records required by this part, an employer who makes deductions from the wages of employees for board, lodging, or other facilities . . . furnished to them by the employer or by an affiliated person, or who furnishes such board, lodging, or other facilities to employees as an addition to wages, shall maintain and preserve records substantiating the cost of furnishing each class of facility except as noted in paragraph (c) of this section");  Herman v. Palo Grp. Foster Home, Inc., 976 F. Supp. 696, 701 (W.D. Mich. 1997), aff'd, 183 F.3d 468 (6th Cir. 1999); Solis v. SCA Rest. Corp., 938 F. Supp. 2d 380, 394 (E.D.N.Y. 2013); Bueno v. Mattner, 633 F. Supp. 1446, 1453 (W.D. Mich. 1986) (holding that defendant was not entitled to credit for housing provided to migrant workers, because the defendant provided no evidence regarding the value of the housing); Leonard v. Carmichael Props. & Mgmt. Co., Inc., 614 F. Supp. 1182, 1187-88 (S.D. Fla. 1985) (same); Fields v. Luther, CIV. No. JH–84–1875, 1988 WL 59963 at *15 (D. Md. May 8, 1988) (unpublished) (farm labor contractor not permitted to deduct gas and electricity from workers'

wages where the only evidence of cost of utilities was average monthly benefits); U.S. Dep't of

Labor, Opinion Letter Fair Labor Standards Act (FLSA) (June 1, 1994), 1994 WL 1004832, at

*2 ("Any employer who furnishes meals, lodging, or other facilities to employees as wages must

maintain the records required in section 516.27 of 29 CFR Part 516.").

   The Defendants are not entitled to credit for the $800.00 per month that was deducted

from Jay and John Koch's cashed paychecks because the Defendants have provided no evidence

substantiating the cost of meals, housing, or any other service in violation of § 516.27(a).

Further, it is undisputed that the Defendants charged nondisabled employees residing in the

Bunk House only $150 to $200 per month.  (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 77),

ECF No. 66-1.)  The Bunk House consisted of two connected double wide mobile homes with

three bedrooms and two bathrooms.  (Id. Ex. 1 (Byrd Dep. 48-50), ECF No. 66-1.)  In addition,

as many as ten workers resided in the Bunk House at a time.  (Id. Ex. 1 (Byrd Dep. 48-50), ECF

No. 66-1.)  Based on the foregoing, the room and board charged to the Disabled Workers is

plainly unreasonable.[5]

   In addition, the Defendants claim to have deducted the $800.00 charge for room and

board for both Mr. Morris and Mr. Jones from the Work Services account.  (Id. Ex. 1 (Byrd

Dep. 77), ECF No. 66-1.)  The money deposited into the Work Services account included

_____

   [5]Even if the Defendants were entitled to a credit for room and board, determining the
appropriate amount would be sheer speculation because the Defendants have failed to come
forward with any evidence to justify the cost.  Further, the Defendants wrongfully converted and
retained the funds in the Work Services account belonging to the Disabled Workers and the
other two intellectually disabled men residing in the Bunk House and this would negate any
possible credit owed to the Defendants for room and board.  (Pl. Mem. Supp. Summ. J. Ex. 1
(Byrd Dep. 137, 142-50 and Exs. 17 - 18), ECF No. 66-1, and Ex. 2 (Perez Dep. 77, 82), ECF
No. 66-2.)

Mr. Morris' and Mr. Jones' monthly social security payments and all four Disabled Workers'

state and federal tax refunds.  (Id. Ex. 1 (Byrd Dep. 77, 97 and Ex. 18 to Byrd Dep.), ECF No.

66-1.)  However, the Defendants are not entitled to a credit for Mr. Morris' and Mr. Jones' room

and board charges as the charges amount to a illegal deduction from Mr. Morris' and Mr. Jones'

wages.

> [T]here is no legal difference between deducting a cost directly from the worker's
> wages and shifting a cost, which they could not deduct, for the employee to bear.
> An employer may not deduct from employee wages the cost of facilities which
> primarily benefit the employer if such deductions drive wages below the minimum
> wage.  This rule cannot be avoided by simply requiring employees to make such
> purchases on their own, either in advance of or during the employment.

Arriaga v. Florida Pac. Farms, L.L.C., 305 F.3d 1228, 1236 (11th Cir. 2002).

Moreover, as discussed above, the Defendants have failed to keep any records with

respect to the room and board payments and the amount charged is plainly unreasonable.  The

monthly social security payments received by Mr. Morris ($1,379.00) and Mr. Jones ($1,236.00)

exceeded the $800.00 per month that the Defendants collected in room and board every month,

and there is no evidence that the Defendants reimbursed Mr. Morris and Mr. Jones for the

excess or provided any of the Disabled Workers with their state and federal tax refunds.  (Pl.

Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 137 and Ex. 17 to Byrd Dep.), ECF No. 66-1.)  In

addition, the funds in this account were used for numerous unrelated business and personal

expenses of the Defendants, including vehicle repairs, personal cell phones and wireless internet

bills, and credit card bills.  (Id. Ex. 1 (Byrd Dep. 142-50 and Ex. 18 to Byrd Dep.), ECF No. 66-

1, and Ex. 2 (Perez Dep. 77, 82), ECF No. 66-2.)  The Defendants failed to keep any accounting

of how the funds in the Work Services account were utilized.  (Id. Ex. 1 (Byrd Dep. 160), ECF

20

No. 66-1, and Ex. 5 (RFP No. 18), ECF No. 66-5.)  The only inference from the competent evidence before the court is that the Defendants repeatedly converted the Disabled Workers' money from the Work Services account for their own use.

### 5. Damages

Under the FLSA, an employer who violates its terms is "liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

### a. Back Wages

"The FLSA typically has a two-year statute of limitations for minimum wage violations. If the violations were willful, however, the period extends to three years after the cause of action accrued."  Perez, 2016 WL 6803779, at *8 (citing 29 U.S.C. § 255(a); Martin v. Deiriggi, 985 F.2d 129, 135 (4th Cir. 1992) (stating a plaintiff "may recover an additional year of back wages when a violation is willful")).  In this context, willful means that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  Reckless disregard is defined in the federal regulations applicable to the FLSA as a "failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]."  5 C.F.R. § 551.104.  However, "[c]onduct that is merely unreasonable or negligent fails to satisfy the willfulness standard.  If the record shows no genuine issue of material fact in dispute as to an employer's willful mindset, a court may rule as a matter of law his violations were willful."  Perez, 2016 WL 6803779, at *8 (internal citations omitted).

The Defendants contend that their conduct was not willful because they had never been subject to an investigation and "assumed that Work Services fell under the farming and agricultural exception contained in the [FLSA]." (Def. Mem. Opp'n Summ. J. Ex. 2 (Byrd Aff. ¶¶ 12, 14), ECF No. 70-2, and Ex. 1 (Perez Aff. ¶ 9), ECF No. 70-1.) Further, Byrd alleges that he relied on the business practices of Henry's Turkey Service in his treatment of the Disabled Workers. (Id. Ex. 2 (Byrd Aff. ¶ 13), ECF No. 70-1.)

At a minimum, there is no genuine issue of fact that the Defendants' conduct reflects a reckless disregard of the FLSA in forging the Disabled Workers' signatures on the back of their paychecks, cashing them, retaining the funds, and failing to keep proper records. As an initial matter, the agricultural exemption is extremely narrow and inapplicable in this action. 20 U.S.C. § 213(b)(12) and (a)(6) sets forth a narrow exemption to the minimum wage and overtime provisions of the FLSA for agricultural employees. 29 C.F.R. § 780.125(b) explicitly excludes the slaughtering of poultry from the definition of primary agriculture. "Secondary farming encompasses, any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." Heath v. Perdue Farms, Inc., 87 F. Supp. 2d 452, 459 (D. Md. 2000) (finding willful violation based on fact that "poultry industry . . . knew that . . . chicken catchers [were] subject" to the FLSA) (internal quotation marks omitted). The Defendants offer no legitimate basis for believing that the Disabled Workers were exempt from the FLSA. The Defendants cited Regan for the proposition that

22

"[i]n reading the provisions contained in 29 U.S.C. § 206(f),[6] it is apparent that turkey processing may be exempt from the FLSA," but this case is inapplicable as it solely involves FLSA claims by firefighters and in no way addresses turkey processing or the agriculture exemption. (Def. Mem. Supp. Summ. J. 9, ECF No. 70.); 142 F. Supp. 3d at 445.

Further, the Defendants had engaged in the practice for many years based on the business practices of Henry's Turkey Service, the prior owner of the business. (Def. Mem. Opp'n Summ. J. Ex. 2 (Byrd Aff. ¶ 13), ECF No. 70-2 (stating that "Henry's [Turkey Service] engaged in a course of conduct whereby they assisted employees who were unable to obtain photo identification or bank accounts in cashing their check" and that Byrd, after purchasing the business in 1985, "operated under the good faith belief, based on my reliance upon the practices of Henry's, [in] similarly assisting the individuals in this case").) This conclusory argument is wholly without merit. First, the Defendants fail to offer any defense for their egregious conduct in forging the Disabled Workers' signatures, cashing their paychecks, and retaining the funds other than to state that this is always how it had been done. Notably, the nondisabled workers performing the same jobs did not have their signatures forged on their paychecks and their funds withheld by the Defendants. Moreover, the Defendants willfully converted the Disabled Workers' money in the Work Services account for their own use. Further, the Defendants failed to keep any records. (Pl. Mem. Supp. Summ. J. Ex. 1 (Byrd Dep. 160), ECF No. 66-1 (Byrd admitted that he "did a really poor job of keeping records.").) Based on the foregoing, the court

---

[6] Section 206(f) addresses domestic service employee "employed in domestic service in a household." The court fails to see how this provision is applicable to turkey processing.

23

finds that the Defendants' conduct was willful and a three-year statute of limitations applies in this case.

The Plaintiff utilized Work Services' weekly time records for the Disabled Workers in calculating the back wages owed to the Disabled Workers. (Id. Ex. 3. (Ellis Aff. ¶ 5), ECF No. 66-3.) After review, the court finds that these calculations are proper. Therefore, utilizing the Defendants' weekly time records for the Disabled Workers, the Plaintiff has properly calculated that the Defendants owe the Disabled Workers back wages totaling $82,701.77. The individual amount of back wages owed to each Disabled Worker is as follows:

1. Mr. Morris – $21,539.75

2. Mr. Jones – $22,804.63

3. Jay Koch – $18,825.44

4. John Koch – $19,531.95

(Id. Ex. 3 (Ellis Aff. ¶ 5), ECF No. 66-3.)

#### b. Liquidated Damages

In addition, the Disabled Workers are entitled to liquidated damages in an amount equal to the back wages owed. "The FLSA provides for mandatory liquidated damages in an amount equal to the unpaid overtime compensation." Perez v. Mountaire Farms, Inc., 650 F.3d 350, 375 (4th Cir. 2011). "Only where the employer shows to the satisfaction of the court that the act or omission giving rise to [the] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of FLSA may the court exercise its discretion to deny liquidated damages." Mayhew v. Wells, 125 F.3d 216, 220 (4th Cir. 1997)

(internal quotation marks omitted).  "The good-faith prong requires proof of objective, not subjective, good faith."  <u>Regan</u>, 142 F. Supp. 3d at 464.

The Defendants allege that their actions were taken in good faith because they believed that the farming and agricultural exception applied and the Defendants had not ever been "subjected to any investigation concerning any issues with wages."  (Def. Mem. Opp'n Summ. J. 6, ECF No. 70.)  For the reasons stated above, this argument is without merit.  In addition, the Defendants again allege that they based their business practices on the business practices of Henry's Turkey Service.  (<u>Id.</u> at 5, ECF No. 70.)  Byrd purchased the Newberry County, South Carolina, portion of Henry Turkey's Service in 1985, thirty-two years ago.  The Defendants' alleged reliance on thirty-two-year-old information does reflect objective good faith.  Based on the foregoing, the Disabled Workers are entitled to liquidated damages equal to the amount of back wages owed, $82,701.77.

### 6. Injunction

Pursuant to 29 U.S.C. § 217, the district court possesses jurisdiction to permanently enjoin the Defendants from further violations of the FLSA.  "A court should normally issue an injunction against the commission of future violations when there is a finding of clear violations of the FLSA."  <u>Perez</u>, 2016 WL 6803779, at *9.   The Defendants willfully violated the FLSA over many years and engaged in a course of conduct that violated the rights of intellectually disabled employees, an extremely vulnerable population.  Further, the court is unconvinced that the Defendants' violations will cease in the absence of an injunction.  Based on the forgoing, the court permanently enjoins the Defendants, their agents, servants, employees and all persons in

active concert or participation with them from violating the provisions of 29 U.S.C. §§ 206, 207(a), 211(c), and 215(a)(5) of the FLSA.

Therefore, it is

**ORDERED** that the Plaintiff's motion for summary judgment, docket number 66, is granted. It is further

**ORDERED** that the Defendants are jointly and severally liable for $82,701.77 in back wages for the period of time from December 3, 2012 to December 15, 2014. It is further

**ORDERED** that the Defendants are jointly and severally liable for $82,701.77 in liquidated damages for the period of time from December 3, 2012 to December 15, 2014. It is further

**ORDERED** that the Plaintiff's request for a permanent injunction is granted, and the Defendants, their agents, servants, employees and all persons in active concert or participation are permanently enjoined from violating the provisions of 29 U.S.C. §§ 206, 207(a), 211(c), and 215(a)(5) of the FLSA.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
February 14, 2017